1
2
3
4
5
6
7
8
9
10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12    LOUIS BACA,

13            Petitioner,                    No. CIV S-03-1685 DFL JFM P

14        vs.

15    MICHAEL KNOWLES, Warden,               AMENDED

16            Respondent.                    FINDINGS & RECOMMENDATIONS

17    _____/

18            Petitioner is a state prisoner proceeding through counsel with an application for a

19    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1998 conviction on

20    charges of first degree murder with special circumstance, discharging firearm from vehicle and

21    enhancement for use of firearm.  He was sentenced to life without possibility of parole plus ten

22    years on March 30, 1998.  He seeks relief on the grounds of ineffective assistance of counsel,

23    failure to obtain a Miranda waiver, and juror bias and misconduct.  Upon consideration of the

24    record and the applicable law, the undersigned will recommend that petitioner's application for

25    habeas corpus relief be denied.

26    /////

FACTUAL BACKGROUND[1]

In the early part of 1997, Villa[, petitioner's co-defendant,] had met [petitioner,] her third cousin, . . . a few times.  [Baca] lived in the Bay Area and had a tattoo on his forearm displaying a Bay Area gang name, "Decoto Gangsters X4."  After one such visit, [Villa] discovered [petitioner's] loaded handgun under her baby's car seat in the back seat of her parents' car.  Although [Villa] insisted she was not a member of a gang, she associated with others who were, including her ex-husband, and her brother had been stabbed by a member of the Tracy Southside gang.

On March 13, Baca drove to Tracy to retrieve his gun from his cousin.  Another cousin Villa had never met had accompanied Baca from the Bay Area.  Villa was angry Baca had endangered her children, but said nothing.  Baca was angry the gun was scratched and he clearly expressed his displeasure.  He was also upset because the gun seemed to be jammed.  He asked her to take him to the store to buy beer.  She obtained permission from her mother, with whom she and her three daughters were living.

On the way to the store, Villa saw two young women, who were later identified as Marie Sturdivant and Celina Martinez, walking on the sidewalk with Celina's brother, David, whom they called "Pelon."  Villa thought they said something as she drove by so she made a U-turn to inquire.  Villa pulled up alongside Celina, Marie and Pelon, at which time Baca jumped out of the car.  He asked Pelon whom he was "dogging."  One of the young women asked who he was.  Baca pulled out a gun and pointed it at their heads.  Pelon said he did not want any trouble.  Baca yelled something like "Decoto" or "Decoto Norte X4" and returned to the car.  Jesse Diaz, who was walking ahead of Celina, Marie and Pelon, heard a male say something like "Norteno" and "look at you guys now."  Celina and Marie both saw Villa smiling or laughing during the confrontation.  They denied being members of a gang.

Villa, Celina and Marie testified no one was yelling or arguing.  Diane Gaarde, although accustomed to noise and violence in her neighborhood, was awakened by loud and angry male and female voices through her closed windows.  She lay in her bed listening but could not understand any of the words spoken.  She described the area as a no-man's land for gangs and confrontations.

---

[1]  This statement of facts is taken from the July 5, 2000 opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 3-6, appended as Exhibit C to Respondent's Answer, filed on February 7, 2003.

Petitioner was tried with his co-defendant, Paulette Villa.  Angel Buckman was identified as another person in the back seat of the car during the incidents at issue herein.  Mr. Buckman was prosecuted separately and pled guilty.  Buckman was called to the stand in the Baca/Villa trial but refused to answer any questions.  (RT 698-709.)

1

2          Meanwhile, Marie, Celina and Pelon walked on to the market.
           Although Pelon mentioned he did not like guns, the trio was rather
3          nonchalant about the assault.  They mentioned it to the store clerk
           but they did not call the police.  As they walked back, they saw the
4          same car again.  Diaz heard a female voice shout "Southside."
           Celina and Marie both denied shouting "Southside."  Villa testified
5          she did not hear anyone shout "Southside."

6          As Villa passed the group a second time, Baca told her to turn
           around.  She complied.  Baca leaned out the window of the car and
7          fired a shot at the three, who by then were running across a field.
           Pelon grabbed his side.  He yelled at his sister and Marie to get
8          down.  They all dropped into the tall grass.  Villa circled around
           and Baca fired two more shots.  The ever-vigilant Mrs. Gaarde
9          heard a female voice from the driver's seat, a male voice from the
           passenger seat and another male voice from the rear seat.  She
10         heard one of the males say, "I got him I got him" in a voice as
           jubilant as if he had just won the World Series.  Pelon died as a
11         result of a gunshot wound to the chest.

12         Villa drove home, by her account, stunned and scared.  She passed
           the police station.  When they arrived home, she went into the
13         house to get Baca money for gas.  She curled up on the floor beside
           the couch and fell asleep.

14         The following morning Baca called.  While being surveilled, she
15         took out the car seat from the rear seat, brushed out the rear seat,
           and hosed down the car, including the door and window on the
16         passenger side.  She testified this was her customary routine before
           leaving for school.  She was arrested before she completed
17         cleaning her car.

18         The investigating officers found two expended .9 millimeter shells
           on the street near the shooting and a bullet in the field into which
19         Marie, Celina and Pelon ran.  During a search of Baca's residence,
           officers confiscated a candy box containing four .9 millimeter
20         casings and an empty box for a Taurus .9 millimeter handgun.  The
           expended bullets and the casings had been fired from the same
21         weapon, which could have been a Taurus handgun.

22         Villa testified in her own defense.  She insisted she did not intend
           for anyone to die.  She stated she did not know the gun was
23         operable or that Baca would actually shoot it.  A divorced mother
           of three young girls, she had gone back to school and had turned
24         her life around.  She was within days of becoming a medical
           assistant with the potential to earn $18.00 an hour.

25  (People v. Paulette Regina Villa, et al., slip op. at 3-6.)

26  /////

                                  3

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result.  Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

1 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

2 habeas court independently reviews the record to determine whether habeas corpus relief is

3 available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

4 II.  Petitioner's Claims

5      A.  Ineffective Assistance of Counsel

6        Petitioner claims that his trial counsel rendered ineffective assistance because of

7 his failure to investigate and present an adequate defense.  He also claims that his appellate

8 counsel rendered ineffective assistance because of his failure to raise on appeal a claim of

9 ineffective assistance of trial counsel.  After setting forth the relevant legal principles, this court

10 will analyze these claims in turn below.

11      1.  Legal Standards

12        The Sixth Amendment guarantees the effective assistance of counsel.  The United

13 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

14 Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

15 counsel, a petitioner must first show that, considering all the circumstances, counsel's

16 performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

17 identifies the acts or omissions that are alleged not to have been the result of reasonable

18 professional judgment, the court must determine whether, in light of all the circumstances, the

19 identified acts or omissions were outside the wide range of professionally, competent assistance.

20 Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

21 counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

22 range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

23 Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

24 acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

25 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

26 /////

1    Second, a petitioner must establish that he was prejudiced by counsel's deficient

2    performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

3    probability that, but for counsel's unprofessional errors, the result of the proceeding would have

4    been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine

5    confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224

6    F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's

7    performance was deficient before examining the prejudice suffered by the defendant as a result of

8    the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

9    lack of sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949,

10   955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

11   Defense counsel has a "duty to make reasonable investigations or to make a

12   reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at

13   691.  It has been recognized that "the adversarial process will not function normally unless the

14   defense team has done a proper investigation."  Siripongs v. Calderon (Siripongs II), 133 F.3d

15   732, 734 (9th Cir. 1998)(citing Kimmelman, 477 U.S. at 384).  Therefore, counsel must, "at a

16   minimum, conduct a reasonable investigation enabling him to make informed decisions about

17   how best to represent his client."  Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995)

18   (quoting Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations

19   omitted); see also United States v. Burrows, 872 F.2d 915, 918 (9th Cir. 1989) (counsel's

20   performance was deficient where counsel failed to investigate the possibility of mental illness

21   defense).  On the other hand, where an attorney has consciously decided not to conduct further

22   investigation because of reasonable tactical evaluations, his or her performance is not

23   constitutionally deficient.  See Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170,

24   1173 (9th Cir. 1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to

25   investigate thus 'must be directly assessed for reasonableness in all the circumstances.'"

26   Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 691).  See also Kimmelman, 477 U.S.

1  at 385 (counsel "neither investigated, nor made a reasonable decision not to investigate");

2  Babbitt, 151 F.3d at 1173-74.  A reviewing court must "examine the reasonableness of counsel's

3  conduct 'as of the time of counsel's conduct.'"  United States v. Chambers, 918 F.2d 1455, 1461

4  (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance

5  claims based on a duty to investigate must be considered in light of the strength of the

6  government's case.'"  Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (quoting Eggleston

7  v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).  See also Hayes v. Woodford, 301 F.3d

8  1054, 1070 (9th Cir. 2002).

9                    2.  Ineffective Assistance of Trial Counsel

10              Petitioner claims that his trial counsel rendered ineffective assistance because of

11  his failure to investigate and present evidence in support of either a mental defect or lack of

12  competency defense.  Petitioner argues his defense counsel failed to present expert testimony on

13  the issue of intent to kill and failed to present any defense based on methamphetamine psychosis

14  or that petitioner's methamphetamine abuse negated the intent to kill.  He contends defense

15  counsel failed to present a mental defect defense based on expert testimony.  Petitioner argues

16  that defense counsel prohibited petitioner from testifying and states petitioner would have

17  testified that he lacked the requisite intent to kill.

18              In support of his claim, petitioner has submitted: (1) his declaration, in which he

19  states, inter alia, that he was unaware of Dr. Howells' report until 2001, when he was preparing

20  his habeas petition, and that trial counsel spent a half hour or less discussing with petitioner

21  whether he would testify, ultimately deciding petitioner would not testify because the district

22  attorney would "tear him up" (July 11, 2003 Exhibits at 61-64, 63); and (2) a declaration from

23  counsel (January 14 2004), to which is appended a supplemental declaration of Dr. Samuel

24  Benson, who addresses the issues raised in the answer and respondent's supporting brief.

25              Respondent urges that the claim be denied on the merits.

26  /////

1    Petitioner presented the following ineffective assistance of counsel claims to the

2   San Joaquin County Superior Court in his petition for writ of habeas corpus: counsel failed to

3   present expert testimony regarding petitioner's lack of intent to kill; counsel failed to offer

4   evidence regarding petitioner's history of mental illness; counsel failed to offer evidence

5   regarding petitioner's "chronic and acute methamphetamine psychosis"; counsel failed to obtain

6   petitioner's informed consent waiving his right to testify; counsel failed to offer evidence in

7   mitigation; and counsel conceded petitioner's guilt in his closing argument.  (Answer, Ex. H.)

8   These claims were rejected by the San Joaquin County Superior Court in a written decision on

9   petitioner's petition for writ of habeas corpus.  (Answer, Ex. H.)  The claim was summarily

10   denied by California Supreme Court on habeas review.  (Answer, Exs. J.)

11    The Superior Court addressed petitioner's ineffective assistance of counsel claims

12   as follows:

13    Petitioner acknowledges that he admitted the shooting and that the
      sole contested issue at trial was whether or not he harbored the
14    requisite intent to kill.  The prosecution needed to demonstrate
      such intent in order to support the charge of first degree murder
15    with special circumstance.

16    With respect to petitioner's first three claims of ineffective
      assistance, petitioner has failed to demonstrate that counsel's
17    decisions were anything other than trial tactics which are not
      reviewable on habeas corpus.  The report cited by petitioner
18    contains as much damaging information as it does beneficial
      statements.  Further, the doctor's opinion regarding petitioner's
19    intent would have been inadmissible at trial.  Petitioner has
      therefore failed to set forth a prima facie case of ineffective
20    assistance of counsel so far as these claims are concerned.  (*People
      v. Weaver* (2001) 26 Cal.4th 876, 29 P.3d 103, 111 Cal.Rptr.2d 2.)
21
      Petitioner has failed to produce any evidence regarding counsel's
22    claimed failure to introduce evidence in mitigation at sentencing.
      He has therefore failed to set forth a prima facie case for habeas
23    corpus relief.  [Citations omitted.]

24    With respect to the third and sixth claims, petitioner has failed to
      demonstrate any prejudice as a result of counsel's actions or that
25

26   /////

8

1   counsel's decisions were not simply trial tactics.  (*Strickland v.
2   Washington* (1984) 466 U.S. 668; *People v. Weaver, supra.*)

3   (Answer, Ex. H.)

4   First, petitioner's claim that defense counsel failed to present mitigating evidence

5   at sentencing must fail.  "It is well-settled that [c]onclusory allegations which are not supported

6   by a statement of specific facts do not warrant habeas relief." Jones v. Gomez, 66 F.3d 199, 204

7   (9th Cir. 1995) (quoting James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)).  Petitioner has failed to

8   support this claim with specific evidence.  This conclusory allegation does not meet the

9   specificity requirement.  Therefore, any federal claim regarding the failure to present mitigating

10  evidence at sentencing should be denied.  In addition, the sentencing judge was aware of

11  petitioner's background and knew petitioner had no prior criminal record.[2]  (See CT 662-65.)

12  Second, petitioner's claim that defense counsel failed to inform petitioner he had

13  an absolute right to take the stand and testify must fail.  The Ninth Circuit has held that a

14  defendant's silence in the face of an attorney's decision not to have the defendant testify waives

15  the defendant's right to testify, even if the defendant was unaware he had an absolute right to

16  testify.  United States v. Edwards, 897 F.2d 445 (9th Cir. 1990)(the court has no duty to advise

17  the defendant of his right to testify, nor is the court required to ensure that an on-the-record

18  waiver has occurred); see also United States v. Nohara, 3 F.3d 1239, 1243-44 (9th Cir. 1993).

19  Therefore, this court cannot find that the state court's rejection of this claim was contrary to or an

20  unreasonable application of clearly established federal law.

21  /////

22

23  [2]  The jury heard that petitioner's father killed his mother.  (See RT 915.)  Petitioner's
24  uncle, Gilbert Rebledo, testified that petitioner was raised by his maternal grandmother from the
    age of three.  (RT 933.)  He confirmed that petitioner began efforts to build a stronger
    relationship with his father's family in Decoto when petitioner was 11 or 12.  (RT 934.)  Officer
25  Sasser testified that when petitioner was arrested he put his head in his hands and started crying.
    (RT 1002.)  Petitioner's grandmother, uncle and girlfriend testified that in their opinion,
26  petitioner was not a violent person.  (RT 937, 948, 984.)

1    Petitioner further contends defense counsel could have used Dr. Howells' report

2    to pursue a defense based on lack of intent due to petitioner's prior head injuries or

3    methamphetamine use or should have earlier investigated and obtained an expert on

4    methamphetamine psychosis in an attempt to negate the element of intent to kill.

5    Dr. Howells administered four separate "screening instruments to indicate the

6    value of performing a more comprehensive neuropsychological or neurological battery of tests to

7    assess or affirm the presence of identifiable organic or neuropsychological problems that might

8    have been related to [petitioner's] previous head injuries or chronic use of methamphetamines."

9    (July 11, 2003 Exhibits at 25.)[3]  Dr. Howells concluded that the "screening instruments do not

10   suggest the presence of organicity."  (Id.)  Given this conclusion, it was not unreasonable for trial

11   counsel to decide not to use this expert testimony at trial or to further inquire or investigate a

12   potential claim of mental defect resulting from head injuries.  Murtishaw v. Woodford, 255 F.3d

13   926, 948 (9th Cir. 2001)(defense counsel may rely on expert consulted).  Defense counsel was

14   not required to continue looking for experts who might testify to the contrary.  See Hendricks v.

15   Calderon, 70 F.3d 1032 (9th Cir. 1995).  Thus, the state court's rejection of this claim was not

16   contrary to or an unreasonable application of clearly established federal law.

17   With regard to a possible methamphetamine psychosis defense, defense counsel

18   had benefit of Dr. Howells' report prior to trial as he received it shortly after August 28, 1997.

19   (RT 7.)  On September 22, 1997, the trial court held an in camera hearing on defense counsel's

20   motion for continuance.  (RT 2-10.)  Defense counsel was aware of the possible

21   methamphetamine psychosis defense because he attempted to obtain a continuance to have an

22   expert in that area prepare a detailed report for defense counsel to consider prior to the trial.

23   (Clerk's Transcript ("CT") 338-45; RT 2-11.)  Defense counsel had provided Ron Seagle, Ph.D.,

24

25   [3] Petitioner scored a full scale IQ score of 97 on the Wechsler Adult Intelligence Scale-
     Revised test, which put "him in the average range at the 42nd percentile compared to a normative
26   group of 19 year-olds."  (Id. at 23.)

an expert in methamphetamine psychosis, with "most of the police reports [and] some of the videotaped confessions of [his] client immediately after the shooting." (RT 8.)  On September 19, 1997, Dr. Seagle had advised defense counsel he could prepare a report within ten days. (RT 8.)

However, the record reflects defense counsel was aware that petitioner's alleged drug use was "a double-edged sword . . . .  You argue to a jury, 'Well, he was high,' and . . . 'Oh, not only is he a murderer, but he's a druggy, too.'" (RT 9.)  Defense counsel knew Dr. Howells' report contained a lot of information that "would not be admissible in the guilt phase." (RT 7.)  Defense counsel expressly stated that he only wanted to bring out petitioner's drug use if he had an expert prepared to come in and testify in a way that would benefit petitioner. (RT 10.)

Jury trial did not begin until October 22, 1997. (CT 384; RT 32.)  Thus, defense counsel had time to obtain Dr. Seagle's opinion concerning a methamphetamine psychosis defense.  Defense counsel also had more time to further consider whether introducing petitioner's methamphetamine use would be more beneficial than harmful to his client.  Because the prosecution had strong evidence and petitioner had admitted to shooting the victim, it was not unreasonable for defense counsel to forego raising petitioner's methamphetamine use.

In addition, petitioner has presented no evidence that drug tests were performed on petitioner on the day he was arrested.  Petitioner has pointed to no testimony in the record that suggests petitioner was acting in a drug-induced manner during the events at issue herein, although admittedly defense counsel was attempting to keep out any reference to petitioner's methamphetamine use.  The only declaration petitioner provided was his own self-serving statement that "[o]n the day in question [he] was completely high on crank, and . . . had just got done smoking a lot of it with [his] cousin, Anthony Baca, before arriving in Tracy." (July 11, 2003 Exhibits at 62.)  However, Anthony Baca testified that late in the day on the day of the murder, petitioner was acting "normal," although he was drinking beer. (RT 616.)  Petitioner has presented no other declarations or evidence substantiating petitioner's drug use at that time.

11

1    Dr. Howells' report also confirms that "no medical verification has been made of

2  [petitioner's] self-described long-term effects." (July 11, 2003 Exhibits at 22.)  Dr. Howells

3  related that petitioner reported "he had a two or three month holiday from the drugs with the

4  support of his grandmother and girlfriend but he was unable to remain off the drug."  (Id. at 21.)

5  But in petitioner's January 9, 2002 declaration, he stated he stopped "using for around 6 months

6  when [he] got a job, but [he] was fired and then got even more hooked than before." (July 11,

7  2003 Exhibits at 62.)  It is unclear whether petitioner is referencing the same period of time or

8  two separate incidences where he refrained from using methamphetamine.

9    Dr. Benson had benefit of additional information that Dr. Howells did not.  Dr.

10  Benson interviewed petitioner's grandmother, uncle and cousin as well as the September 22,

11  1997 transcript from the trial, the state appellate court's opinion and petitioner's 2002 petition for

12  writ of habeas corpus. (July 11, 2003 Exhibits at 1, 7.)[4]  All of these persons are relatives of

13  petitioner and might wish to see petitioner obtain a new trial.  Dr. Benson's report does not make

14  clear what independent evidence he reviewed that demonstrated petitioner was "in a state of

15  extreme and prolonged drug induced psychosis." (July 11, 2003 Exhibits at 1.)

16    It appears that most of the evidence supporting a potential methamphetamine

17  psychosis defense would be based on petitioner's self-serving statements concerning his drug

18  use.[5]  Dr. Howells stated petitioner was less than candid during interviews and "seemed very

19  intent on convincing [him] of the overwhelming power and control of methamphetamines while

20  minimizing information on what [petitioner] did in order to pay for his habit." (July 11, 2003

21

22    [4] Dr. Benson also reviewed Dr. Howells' report, newspaper articles regarding the instant
    crime as well as the murder of petitioner's mother, 1980 guardianship order, school records,
23  photographs, letters to Mary from petitioner and a letter written by Louis Trejo regarding Louis.
    (Id. at 7.)  It is not clear from Dr. Benson's report whether any of these items contained
24  independent evidence of petitioner's drug use.

25    [5] Although petitioner states evidence of petitioner's heavy methamphetamine use at and
    before the time of the shooting was "available and abundant" (Attachment A to Petition, at 2),
26  petitioner has not specifically identified this evidence.

1   Exhibits at 32.)  Dr. Howells further stated it was "clear from the videotapes of his interrogations

2   that he had done the same thing with the Tracy police officers and they correctly confronted him

3   when they obtained contradictory information from other sources." (Id. at 32.)

4          Thus, any methamphetamine expert could have testified only to the general effects

5   of methamphetamine.  Murtishaw v. Woodford, 255 F.3d 926, 948 (9th Cir. 2001) (holding that

6   trial counsel was not ineffective where counsel did not obtain blood samples for PCP testing

7   because "[t]he tests would not have pinned down the dates on which [defendant] used PCP, nor

8   would they have shown that [defendant] was intoxicated by PCP at the time of the shootings.").

9          The Ninth Circuit Court of Appeals  has also held that even where there is a

10  strong basis for a mental defense, an attorney may forego that defense where the attorney's

11  experts would be subject to cross-examination based on equally persuasive psychiatric opinions

12  that reach a different conclusion.  Harris v. Vasquez, 949 F.2d 1497, 1525 (9th Cir.1990), cert.

13  denied, 503 U.S. 910 (1992).  Dr. Howells' clinical impression was that petitioner "is an

14  emotionally disturbed person, probably possessing a personality disorder. . . . [and] has chronic

15  depressive problems as well." (July 11, 2003 Exhibits at 31.)  He further opined that "no

16  personality disorder, whether avoidant, anti-social (sociopathy), or whatever, can be considered

17  to be an excuse for criminal behavior."  (Id.)

18         Petitioner has now been able to obtain an expert witness, Dr. Samuel G. Benson,

19  M.D., Ph.D., who claims there is more objective testing that could be performed to verify the

20  clinical diagnostic information (id. at 5), and states "with a medical certainty that this young man

21  was mentally compromised at [the] time of his alleged crime and it is highly improbable that he

22  had the ability to appreciate the nature or quality of his act, to understand the consequences of his

23  act, or to understand that it was wrong."  (Id. at 2.)  However, based on Dr. Howells' report, it is

24  also likely the prosecution could come up with its own expert to rebut Dr. Benson's findings.

25         Petitioner argues that defense counsel should have presented expert testimony and

26  had petitioner testify at trial in an effort to negate the element of intent to kill.  It is possible that

1  had defense counsel presented a methamphetamine psychosis defense and put petitioner on the

2  stand where he would testify that he did not intend to kill the victim, the jury might have found

3  petitioner guilty of second degree murder rather than first degree murder.  But that is not the

4  standard on collateral review.  Strickland prejudice is found where "there is a reasonable

5  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

6  been different . . .[, that is,] a probability sufficient to undermine confidence in the outcome."

7  Strickland, 466 U.S. at 694.  Based on the strong evidence the prosecution presented, it is just as

8  likely that even had defense counsel put on such a defense, the jury still would have found

9  petitioner guilty of first degree murder.  The jury would have had to find petitioner to be credible

10  and disregard the strong inference of intent from petitioner's actions that night.  The court has

11  reviewed the record and, in light of all the evidence, cannot find that had petitioner taken the

12  stand and defense counsel had presented a methamphetamine psychosis defense there is a

13  reasonable probability that the result of the trial would have been different.

14          Trial counsel's failure to pursue a mental impairment defense based on use of

15  methamphetamines may have fallen below the level of reasonably effective assistance.  However,

16  the evidence is clear on the record that no prejudice resulted from any deficient representation.

17  Petitioner has failed to establish a reasonable probability that even with the defense, the result of

18  the proceeding would have been different.  Petitioner admitted he shot the victim.  His acts were

19  more than sufficient to demonstrate intent to kill:  he initially jumped out of Villa's car and

20  threatened Marie Sturdavant, Celina Martinez and David Martinez by pointing his gun at their

21  faces, he went to the trouble of unjamming his gun ostensibly so he could shoot someone, he and

22  Villa returned to confront the three in the field, he pointed his gun at the victims as they ran, and,

23  finally, after a shot was fired, Villa continued to drive around the field and petitioner shot the gun

24  at least one more time.  In the face of this strong evidence, it is unlikely that a methamphetamine

25  psychosis defense would have changed the outcome herein.  Because of petitioner's inability to

26  /////

1  meet the second prong of the test for ineffective assistance of counsel under <u>Strickland</u>, <u>supra</u>,

2  petitioner's ineffective assistance of counsel claims should be denied.

3          3. <u>Appellate Counsel</u>

4        Petitioner claims that his appellate counsel was ineffective in failing to raise the

5  ineffective assistance of counsel claims contained in the instant petition on direct appeal.  This

6  claim was denied by the San Joaquin County Superior Court to which it was presented.  (<u>See</u>

7  Answer, Ex. H.)

8        The <u>Strickland</u> standards apply to appellate counsel as well as trial counsel.  <u>Smith</u>

9  <u>v. Murray</u>, 477 U.S. 527, 535-36 (1986); <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989).

10  However, an indigent defendant "does not have a constitutional right to compel appointed

11  counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

12  professional judgment, decides not to present those points."  <u>Jones v. Barnes</u>, 463 U.S. 745, 751

13  (1983).  Counsel "must be allowed to decide what issues are to be pressed."  <u>Id.</u>  Otherwise, the

14  ability of counsel to present the client's case in accord with counsel's professional evaluation

15  would be "seriously undermined."  <u>Id.</u>  <u>See</u> <u>also</u> <u>Smith v. Stewart</u>, 140 F.3d 1263, 1274 n.4 (9th

16  Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

17  not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

18  meritless arguments on a client's behalf.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687-88 (requiring a

19  showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

20  to raise a weak issue.  <u>See</u> <u>Miller</u>, 882 F.2d at 1434.  In order to demonstrate prejudice in this

21  context, petitioner must demonstrate that, but for counsel's errors, he probably would have

22  prevailed on appeal.  <u>Miller</u>, 882 F.2d at 1434, n.9.

23        Petitioner's appellate counsel apparently reviewed the trial transcripts and raised

24  the issues he believed had the most merit.  This decision was "within the range of competence

25  demanded of attorneys in criminal cases."  <u>McMann v. Richardson</u>, 397 U.S. 759, 771 (1970).

26  Although petitioner faults counsel for not raising the ineffective assistance of counsel claims

1    contained in this petition, this court has evaluated those claims and determined petitioner could

2    not demonstrate prejudice under <u>Strickland</u>.  Accordingly, petitioner is unable to demonstrate

3    prejudice here, either.  After a review of the record, this court concludes that the state court

4    determination with regard to petitioner's claim of ineffective assistance of appellate counsel was

5    not contrary to, or an unreasonable application of <u>Strickland</u>.  Accordingly, petitioner is not

6    entitled to relief on this claim.

7            B.  <u>Failure to Obtain a Valid Miranda Waiver</u>

8            Petitioner claims that the trial court erred by admitting statements he made to

9    custody officer Gary Bayne.  Petitioner had written a county jail inmate request form requesting

10   to be transferred to a different jail based on his fear of retaliation.  Petitioner contends he was in

11   custody at the time and Officer Bayne was under an obligation to advise petitioner of his

12   *Miranda* rights prior to questioning petitioner about the events at issue herein.  Defense counsel

13   objected to the admission of these statements, but the trial court overruled the objections.

14           Despite the trial court's finding, without analysis, that petitioner was in custody

15   for purposes of <u>Miranda</u>, respondent contends petitioner was not.  Respondent argues that

16   petitioner initiated the contact, Officer Bayne visited petitioner in his cell rather than taking him

17   to a separate room, petitioner sat on his bunk during the interview and Officer Bayne stood in the

18   cell while the cell door remained open, Officer Bayne did not confront petitioner with evidence

19   of his guilt; indeed, Officer Bayne testified he knew nothing of petitioner's background prior to

20   going to the cell and asked petitioner questions relating to his transfer request, and there is no

21   evidence Officer Bayne attempted to detain petitioner against his will.

22           Finally, respondent argues that even if petitioner's <u>Miranda</u> rights were violated,

23   that violation "did not have a substantial and injurious effect or influence in determining the

24   jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).  Thus, respondent contends,

25   the state court's decision to apply harmless error analysis is entitled to deference as a reasonable

26   application of <u>Chapman v. California</u>, 386 U.S. 18 (1967).

1    The last reasoned rejection of this claim is the decision of the California Court of

2  Appeal for the Third Appellate District on petitioner's direct appeal.  (Answer, Ex. C.)

3  Petitioner's argument in this regard was rejected without comment by the California Supreme

4  Court in denying the petition for review.  (See Answer, Exs. E.)  The California Court of Appeal

5  explained the background to the claim and its reasoning in rejecting it as follows:

> Baca requested to be transferred from the San Joaquin jail because he feared gang retaliation.  He sent a note to a jail custody officer pleading for an immediate transfer.  The officer went to Baca's cell to inquire why he wanted to be transferred.  He did not read Baca his *Miranda* rights.[6]  Baca volunteered information about the murder, admitting he had exhibited a firearm, threatened the victim and later shot at the group.  The trial court allowed the prosecution to introduce evidence of Baca's admission over his objections.  He contends the statements were inadmissible.  (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308]; *People v. Morris* (1987) 192 Cal.App.3d 380, 387-390.)
>
> We need not explore, as the Attorney General suggests, whether Baca, as an inmate, was in custody for purposes of *Miranda*.  We prefer to avoid the absurd legal distinctions the Attorney General proffers.  If there was any *Miranda* error, it was harmless beyond a reasonable doubt.
>
> There is no question that Baca shot and killed Pelon.  Villa testified he fired three shots, Celina and Marie both identified him as the shooter, and the expended shells matched casings found in his bedroom.  Baca insists, however, there was some question as to his intent.  Absent the incriminating statements, he maintains the jury might have found he did not intend to shoot the victim, that the shots were fired randomly.  Not a chance.
>
> The jury heard overwhelming evidence that Baca shot with the intent to kill.  He came to Tracy to retrieve his gun.  He made sure to take it with him to the store rather than storing it in his car at Villa's house.  During the first confrontation with Pelon and his companions, he immediately drew his gun and pointed it at their heads, threatening them.  Hence, the shooting a few minutes later hardly can be characterized as random.
>
> Moreover, the jury also heard substantial evidence of Baca's gang affiliation, including expert testimony on gang behavior.  Baca's behavior fit the gang profile.  During the initial confrontation, he shouted his gang name at the victims.  He bore the insignia on his

---

[6]  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

17

1       arm.  The drive-by shooting, while random to those outside the
        gang culture, was a predictable outcome of the earlier threat of
2       violence.  (*People v. Montes, supra,* 74 Cal.App.4th at p. 1056.)

3       In sum, the jury did not need to hear any incriminating statements
        from the [petitioner's] own mouth.  His actions spoke volumes.
4       We conclude the admission of those incriminating statements was
        superfluous, and if their admission was erroneous, the error was
5       harmless beyond a reasonable doubt.

6   People v. Villa, et al., slip op. at 26-28.

7           Petitioner also included claims concerning an alleged Miranda violation in his

8   petition for writ of habeas corpus filed in the San Joaquin County Superior Court.  (See Answer,

9   Ex. F.)  On February 5, 2002, the Superior Court rejected these claims as well:

10      The issues of the *Miranda* violation . . . were raised on appeal and
        rejected by the court.  To the extent petitioner contends these are
11      new issues, each of them could have been raised on appeal.
        Petitioner's arguments on these points therefore provide no basis
12      for habeas corpus relief.  (*In re Harris* (1993) 5 Cal.4th 813, 844
        P.2d 391, 21 Cal.Rptr.2d 373; *In re Waltreus* (1965) 62 Cal.2d
13      218, 42 Cal.Rptr. 9, 397 P.2d 1001.)

14  (Answer, Ex. H)

15          1.  Legal Standards

16          Trial errors that occur during the presentation of the case to the jury are amenable

17  to harmless-error analysis because they may be quantitatively assessed in the context of other

18  evidence presented in order to determine their effect on the trial.  See Brecht v. Abrahamson, 507

19  U.S. 619, 629 (1993); Arizona v. Fulminante, 499 U.S. 279, 307 (1991).  A federal habeas

20  petitioner is not entitled to relief unless the trial error "'had substantial and injurious effect or

21  influence in determining the jury's verdict.'"  Brecht, 507 U.S. at 637 (quoting Kotteakos v.

22  United States, 328 U.S. 750, 776 (1946)).  The error must have resulted in "actual prejudice."  Id.

23  (citation omitted); see, e.g., Alvarado v. Hickman, 316 F.3d 841, 855-57 (9th Cir.), cert. granted,

24  Yarborough v. Alvarado, 539 U.S. 986 (2003) (finding Brecht prejudice where confession

25  obtained in violation of Miranda was admitted at trial even though defendant testified at trial;

26  defendant's testimony could be disregarded because decision to testify was a tactical choice likely

                                        18

influenced by the prosecutor's use of the confession, and the remaining testimonial evidence was inconsistent or only marginally useful to the prosecution); Hardnett v. Marshall, 25 F.3d 875, 881 (9th Cir.1994), cert. denied, 513 U.S. 1130 (1995) (no actual prejudice from introduction of inadmissible hearsay regarding petitioner's intent where petitioner found not guilty of first-degree murder).

A federal habeas court reviewing the prejudicial effect of constitutional trial error does not simply examine whether there was sufficient evidence to support the conviction in the absence of the constitutional error. Regardless whether there is sufficient evidence to support the conviction apart from the error, the court must determine whether the error had a substantial and injurious effect or influence on the conviction. If it did, the court must set aside the conviction. Ghent v. Woodford, 279 F.3d 1121, 1127 (9th Cir.2002) (finding prejudice under Brecht from admission of evidence obtained in violation of Miranda after examining effect of erroneously admitted evidence only on disputed issue of petitioner's mental state, not on undisputed question of whether petitioner actually committed crimes).

In the instant case, petitioner was arrested on Friday, March 14, 1997. (RT 809.) On March 17, 1997, petitioner was visited by Officer Bayne. (RT 790.) Petitioner was not arraigned until March 18, 1997. (RT 809.)

On March 17, 1997, petitioner was housed in the San Joaquin County Jail in its administrative segregation unit, where he had been placed in protective custody. (RT 799; 848-49.) Petitioner was interviewed by a law enforcement officer, Officer Bayne, who was a Deputy Sheriff with the San Joaquin County Sheriff's Department and worked as a classification officer. (RT 787-88; 840.) Officer Bayne presented at petitioner's cell in his sheriff's deputy uniform. (RT 791.) Officer Bayne went to petitioner's cell in response to petitioner's written request that he be transferred because he was in fear for his safety. (RT 806; 843.) Petitioner wrote:

> I need an immediate conversation to talk about a transfer to Santa
> Rita to do my time, but still come to court over here. My situation
> is critical. It is about the gangs out here and my case. Please

> [underlined twice] make a date as soon as possible and I'll even
> offer to pay the cost of bringing me back and forth.  Please help
> me, this is my life [last three words underlined twice].

(RT 806 (Officer Bayne read this portion of petitioner's county jail inmate request form (RT 788) into the record); 855-56.)[7]   The entire conversation took place in petitioner's county jail cell with the cell door open.  (RT 845; 856.)

Officer Bayne demonstrated how petitioner showed him that petitioner held the gun and pointed to it and said to a person, "You want some of this?"  (RT 842.)  Officer Bayne testified that petitioner told him that he fired the gun at a group of people while they were running away from him.  (RT 842.)  Officer Bayne testified that petitioner then fired the gun again into the air.  (RT 843.)

On cross-examination, Officer Bayne admitted he had not recorded the interview, had not taken notes, and did not write up his report concerning the conversation until later in the afternoon.  (845-46.)  Officer Bayne confirmed that none of his report contained specific quotes from petitioner but was just paraphrasing what Officer Bayne understood petitioner had said.  (RT 847.)  Officer Bayne confirmed he had no knowledge of petitioner's crime or background when he went to petitioner's cell.  (RT 847-48.)  At the time Officer Bayne interviewed petitioner, the officer had an application pending with the Tracy Police Department.  (RT 850.)  Officer Bayne confirmed that when he went to see petitioner he assumed petitioner was represented by an attorney.  (RT 851-52.)  However, Officer Bayne confirmed he made no effort to find out whether petitioner was represented by counsel before he went to see petitioner.  (RT 852.)  In his report, Officer Bayne stated petitioner told him that petitioner had heard the victim was gang-related and that the Tracy gang would seek retaliation, but petitioner did not identify who told him and Officer Bayne did not ask.  (RT 852.)

---

[7] Citations to the record prior to page 839 are to testimony taken on the record but outside the presence of the jury during the hearing on defense counsel's objections to the admission of Officer Bayne's testimony.  (See RT 788-812.)

1    On redirect exam, Officer Bayne explained that he went to see petitioner without

2   prior knowledge of petitioner's circumstances because of the "way he wrote the inmate request

3   form." (RT 854.) "There was a sense of urgency and seeings as he was relatively young and

4   how he underlined some of the phrases, it told me there was a sense of urgency, I should talk to

5   him right away." (RT 854.) "I was fearing he may be suicidal or being threatened to the point he

6   needed to be moved." (RT 856.)

7    Officer Bayne explained that his quotation marks around "You want some of

8   this?" in his report meant that was how Officer Bayne remembered exactly what petitioner said.

9   (RT 856.) Officer Bayne testified that after petitioner first exhibited the gun, petitioner told him

10  that the three people backed down, said no and walked away. (RT 856.) A little while later,

11  when petitioner approached the three again, the three started to run and petitioner pulled out his

12  gun, fired at the group and then fired the gun again into the air. (RT 856-57.)

13    Officer Bayne testified that petitioner told him petitioner's cousin, Angel

14  Buckman, was also housed at the jail. (RT 859.) Immediately after his interview with petitioner,

15  Officer Bayne visited Mr. Buckman to see if he had the same fears as petitioner. (RT 859.)

16  Officer Bayne confirmed that petitioner told him "the crime committed was gang related, he was

17  in fear of being in [the San Joaquin County] Jail . . . [and] wanted to be moved to Santa Rita

18  County Jail in Alameda County." (RT 860.) Officer Bayne confirmed that it was not unusual for

19  him to write reports about inmates expressing fears about their safety in jail. (RT 860.)

20    Because there was no question that petitioner shot the gun, this court must

21  examine the effect of that testimony on the question of petitioner's mental state, not on the

22  question whether petitioner actually committed the underlying criminal acts. On the present

23  record, even assuming petitioner's statements to Officer Bayne violated Miranda, this court

24  cannot find that the admission of Bayne's testimony had a substantial or injurious effect or

25  influence on the verdict. Eyewitnesses testified that petitioner first confronted Celina, Marie and

26  the victim on the street by pointing a gun in their faces. Then, later, petitioner and Ms. Villa

21

returned to confront the three of them again.  This act alone demonstrates petitioner's intent.
Petitioner shot at the three as evidenced by the fact that he hit the victim, hitting him in the heart,
which further demonstrates intent.  Even after shooting at the group once, Ms. Villa continued to
drive around the field and petitioner shot again.  It is unlikely, given petitioner's own actions that
night, that a jury would believe petitioner's acts of shooting at the three in the field were merely
"random."

In addition, Diane Gaarde, a neighbor who lived one block from Central Avenue
on Sixth Street, heard the two shots.  (RT 220.)  Shortly thereafter, a car squealed right by her
bedroom window and she heard a young male voice shout, "I got him.  I got him."  (RT 226;
252.)  Ms. Gaarde testified that the voice sounded "very jubliant, very pleased with himself."
(RT 226.)  If the jury found Ms. Gaarde to be credible, this provided further evidence of
petitioner's intent.

The admission of petitioner's statement, "You want some of this," was not
prejudicial because the jury had already heard from three eyewitnesses that petitioner had
threatened Marie, Celina and the victim with a gun on Central Avenue.  While petitioner's
statement to Officer Bayne that he had fired at the group as they ran away was more prejudicial,
Celina testified that she saw petitioner shoot the gun:  "he held it and just pointed it out the
window."  (RT 509.)  "He was a little bit out the window, pointing."  (RT 522.)  Celina
demonstrated for the court how that looked, and the court explained, "It appears her arm and
shoulder are out the window extended out."  (RT 522.)  She testified that "it looked like
[petitioner] was aiming straight for my brother."  (RT 522.)  Celina testified she was able to see
petitioner shoot the gun because she was looking straight at the car while she was kneeling in the
grass, hiding.  (RT 523-24.)  Villa's testimony corroborated the fact Celina could see petitioner
because Villa testified that when the first shot was fired, Villa saw Celina going down in the
grass.  (RT 1041; 1194.)  If the jury believed Celina, her testimony was sufficient to demonstrate
petitioner's intent to kill.

1    The prosecutor mentioned Officer Bayne's testimony in his closing, reminding the

2  jury petitioner had initially said "Do you want some of this?" and that later he had pulled his gun,

3  fired at the group and then again in the air.  (RT 1248; 1313.)  However, the prosecutor argued

4  that petitioner had made a self-serving statement, that he wasn't firing in the air by leaning out,

5  he was firing to shoot to kill.  (RT 1248; 1257; 1313.)  On cross-examination, Villa confirmed

6  she saw petitioner leaning way out the window.  (RT 1099-1100.)  Villa confirmed petitioner was

7  leaning out the window for the second and third shots.  (RT 1142; 1144, 1145.)  This testimony

8  was sufficient to raise an inference that petitioner was aiming to kill his victim.

9    Although petitioner argues here that the prosecution relied heavily on petitioner's

10  statements to Officer Bayne (P's & A's at 7), the record reflects that the prosecution only

11  mentioned Officer Bayne's testimony three times in the first part of closing argument (RT 1248,

12  1257, 1313) and not at all in his final closing given after the defense closed.  (RT 1383-1418.)[8]

13  There was plenty of other evidence for the prosecutor to cover which did not necessitate a heavy

14  reliance on Officer Bayne's testimony.

15    "Actions speak louder than words," the prosecution twice reminded the jury in

16  closing argument.  (RT 1245; 1396.)  The prosecution reminded the jury that the doctor testified

17  that the bullet traveled from right to left, and argued that the victim was upright when hit,

18  probably protecting the other two girls.  (RT 1246-47.)  The gunshot hit the victim through the

19  heart – the prosecution reminded the jury there was evidence petitioner was a good shot.  (RT

20  1247.)  The prosecution further argued that petitioner took the time to unjam the gun which was

21  further indication petitioner intended to kill.  The prosecution also noted that the fact petitioner

22  was leaning out of the car, rather than just sticking his arm out the window, also supported an

23  inference that petitioner was aiming and intending to kill.  (RT 1396-97.)

24  /////

25  ─────────────────────

26  [8] Out of 102 pages of closing arguments, the prosecution referred to it on only three
pages.  (RT 1233-74; 1288-1314; 1383-1418.)

And, while petitioner contends the car was moving fast and it was too dark for petitioner to have been shooting to kill, there was testimony to the contrary.  Marie testified she did not believe the car was moving on the first shot.  (RT 350.)  She testified that it seemed the car moved slowly to her.  (RT 407.)  Marie also testified that after the third shot, the car came back on Seventh Street, drove by real slow, looking, then left the area.  (RT 341.)  Villa testified she could not recall how fast she had been driving.  (RT 1146.)  Although Villa could not recall how fast she was driving after the shooting, but stated if she was driving fast she wouldn't have been able to turn on C Street.  (RT 1198.)

While much of the evidence supporting the prosecution's theory of petitioner's intent to kill was circumstantial, there was persuasive evidence that petitioner set about to confront the victim, with a gun, on two separate occasions.  Because of this evidence, this court cannot find that the admission of Officer Bayne's testimony had a substantial or injurious effect on the jury's verdict.  Thus, the state court's denial of this claim was not contrary to, nor an unreasonable application of, Supreme Court authority.

C.  Juror Bias and Misconduct

Petitioner claims juror bias and misconduct tainted the jury verdict by impermissible outside influences.  Petitioner alleges that Juror No. 2 lied during voir dire by concealing the fact she had a job application pending for a position that would require her to work closely with the district attorney's office.  Petitioner contends this constitutes actual bias.  Petitioner also alleges Juror No. 5 on two occasions spoke with nonjurors about the case, which petitioner contends was misconduct as it brought extraneous evidence into the jury room.  Petitioner also alleges actions by Jurors No. 3 and No. 4 constituted misconduct.

Jurors No. 2 and No. 5 submitted declarations to the trial court following the verdict (Clerk's Augmentation on Appeal ("CAA"), at 16-22), which were heard by the trial court on defense counsel's motion for new trial.  These declarations read as follows:

/////

Juror No. 2

1.  I was Juror #2 in *People v. Louis Baca*; Case No. SC61757(C).

2.  After two and one-half days of deliberations, I was overwhelmed by the experience and stressed out about the fact that I was the lone holdout for not guilty.  I voted to convict [petitioner] of First Degree Murder With Special Circumstances in order to be able to get out of the jury room and get it over with.

3.  I was not convinced beyond a reasonable doubt that [petitioner] was guilty of First Degree Murder.

4.  After the verdict was read in open court on November 18, 1997, I felt uncomfortable about the fact that I had voted to convict [petitioner] of First Degree Murder despite the fact that I had a reasonable doubt as to his guilt of that charge.

5.  On November 19, 1997, at approximately 3:00 p.m. I attempted to reach Judge Richard Guliani by telephone, but he was unavailable.  I left a message requesting that Judge Guiliani call me back.  Later that afternoon Judge Guliani called me back.  During this telephone conversation, I told Judge Guiliani that I felt uncomfortable with the decision that we made on [petitioner].  That I did not feel that it was First Degree Murder, but I did not know ho long I had to hold out in order for it to be considered a hung jury.  I held out for two and one-half days, but I didn't know if that was long enough or if I had to hold our for a week, or a month, or how long I had to hold out.  And that I had said yes to First Degree Murder and I did not really feel that it was First Degree Murder.

I felt that there was a reasonable doubt as to intent to kill.  I did finally say "yes" in order to be able to get out of the room and get it over with.

6.  I further told Judge Guliani that I went along with the opinion of the other eleven people because there were some very strong personalities who knew a lot about guns and felt that nobody would shoot a gun unless they intended to kill.  I was not convinced of that myself, but I eventually voted "yes" to be able to get it over because I felt very uncomfortable after two and one-half days of deliberations.  It was a very tense situation that was not going anywhere.

7.  I was not convinced beyond a reasonable doubt.  I felt that I had a reasonable doubt of intent to kill and express malice aforethought.

8.  I had learned through casual conversation with Juror #3, that he was a Vietnam veteran.  During deliberations he often expressed

the opinion that anyone who points a gun at someone else intends to kill the person.

9. Juror #4, shared the fact that someone close to him engaged in the sale of firearms. He claimed to have acquired special knowledge regarding guns as a result of interacting with this person. He also expressed the opinion that anyone who points a gun a[t] someone else intends to kill that person. I do not agree with the opinion expressed by jurors #3 and 4.

10. During the pendency of this matter, the "nanny" case was receiving national media coverage. During the deliberations Juror #4, said to the other jurors "we have an insurance policy if we make the wrong decision. The judge will overrule us like the judge in the 'nanny' case.["]

11. Juror's # 3, 4 and 6 insisted that we only consider Murder in the First Degree and reach a unanimous verdict before we could consider Second Degree Murder or Manslaughter. I did not agree with this strategy. I thought that if we all considered Second Degree Murder and reached a unanimous verdict it would be easier for us to deliberate with respect to First Degree Murder. I suggested to the other jurors that we leave First Degree and consider Second Degree and Manslaughter. They refused to do so. One of the jurors said that Second Degree Murder does not apply in this case. It only applies in cases such as drunk driving with death when no weapon such as a gun is used.

12. At the end of the day on Friday, November 14, 1997, after two days of deliberations, I told the other jurors that I felt that I wasn't going to change my mind. I told them that I didn't see anything that would convince me otherwise, that I still had a reasonable doubt, but if they wanted me to vote guilty, I would.

13. After one-half day of deliberations on Monday, November 17, 1997, I changed my vote from Not Guilty to Guilty because I didn't know how long that I had to hold out to be considered a hung jury, and I was feeling pressure from other people there even though they were not verbally expressing any pressure towards me. I was feeling pressure to get on with it and that they weren't going to change their minds. I wasn't going to be able to convince them. I voted guilty so that we could get it over with. I voted guilty hoping that Juror # 4 was right when he told us that "If we are wrong the judge will over-rule us."

14. I am a San Joaquin County employee. We haven't had a raise in three years. The County is always saying it's broke, it has no money, and I know the cost to the County of having a re-trial would be very expensive.

/////

15.  At the time of these events, I had submitted an application to be considered for a position as an investigator with the San Joaquin County Welfare Department.  Investigators in the welfare department work directly with the District Attorney's Office in obtaining convictions for welfare fraud and I didn't know how my raising these questions would affect me at a later date if I'm given the investigator position.  I felt that perhaps the people doing the hiring for the County would look at the fact that I caused a hung jury as a reason to not hire me as an Investigator.

16.  Ultimately I succumbed to these pressures and voted for guilty against my will.

(Juror No. 2's March 3, 1998 Decl. CAA, at 16-19.)  Juror No. 2 was not asked about nor did she reveal her pending employment application during voir dire or in her questionnaire.  (Aug 2 CT 1-15; Aug RT 163, 177; Transcript of November 13, 2003 Interview with Juror No. 2, appended as Exhibit to January 14, 2004 Decl, at 10-11[9].)

Juror No. 5

1.  I was Juror No. 5 in *People v. Louis Baca* No. SC61757 (C).

2.  After one and one. . . half days of voting not guilty, I voted to convict [petitioner] of First Degree Murder with Special Circumstance.

3.  A couple of men with strong personalities claimed to know a lot about guns.  Juror No. 3 and Juror No. 4 were very outspoken about their special knowledge regarding guns.

4.  I have very limited knowledge regarding guns.  On or about November 13, 1997, I asked my son-in-law, who knows more about guns than I do to explain to me how a casing might get jammed in a gun.  He provided me with an explanation.  The jamming of casings in a gun were issues discussed during the course of deliberations.  I told Juror No. 6, the Jury Foreman, of my discussion with my son-in-law.  He said maybe we should go to the judge with this.

---

[9]  In her November 2003 interview, Juror No. 2 stated "As far as my job application there were no questions on the questionnaire going into that, it was just that I was on a list of eligibles that I was interviewed for a position and I never even considered that until the point after the verdict.  At the point when we were in deliberation, I'm sorry not after the verdict, but when we were in deliberation and the district attorney . . . I felt that there was a chance that I would not get a position with the district attorney if I went against the district attorney in that decision."  (January 14, 2004 Decl. at 11.)

5. Juror No. 3 and Juror No. 4 expressed the opinion that anyone who points a gun at someone else intends to kill that person. They also said that a person would not have to have a good aim to hit a target when firing a handgun. One would just have to point the handgun in the direction of the target to hit it. I did not agree with either of these opinion is, but I deferred to their claimed superior knowledge about guns.

6. Juror's No. 3 and 4 told us that they had gone home after deliberation and conducted experiments with their own handguns to determine how a casing would jam in their guns. They shared the results of their experiments with the other Jurors during deliberations the next day.

7. Juror's 3, 4 and 6 insisted that we only consider Murder in the First Degree and reach a unanimous verdict before we could consider Second Degree Murder or Manslaughter. I did not agree with this strategy. I thought that if we all considered Second Degree Murder and reached a unanimous verdict it would be easier for us to deliberate with respect to First Degree Murder. After one full day of deliberations I went home and asked my husband if he thought that the procedure that these jurors were insisting on was proper. He told me to ask the judge the next day. I failed to ask the judge, but I did suggest to the other jurors that we leave First Degree and consider Second Degree and Manslaughter. They refused to do so.

8. At one point during the course of deliberations Juror No. 2, who had been voting not guilty said "How can you put a 19 year old boy in prison for the rest of his life." Juror No. 4 responded by saying "No matter how we vote the judge can change the verdict." "If we are wrong he can over-rule us."

9. At one point during the course of deliberations one of the jurors suggested that [petitioner] may have shot Daniel Martinez to be initiated into a gang or to earn his gang colors.

10. I was not convinced beyond a reasonable doubt that [petitioner] was guilty of First Degree Murder with Special Circumstances when I changed my vote from not guilty to guilty on November 14, 1997. Nor was I convinced on November 18, 1997 when the verdict was read in open court. I am not convinced beyond a reasonable doubt that [petitioner] is guilty of First Degree Murder with Special Circumstance even today.

11. I was persuaded to vote guilty by the strong willed Jurors who caused me to believe that they were more knowledgeable regarding guns and gangs. Most importantly I decided to vote guilty because I felt secure in the representations of Juror No. 4 that "If we were wrong the judge would overrule us."

(Juror No. 5's March 3, 1998 Decl. CAA, at 20-22.)  The Deputy District Attorney contacted Jurors Nos. 3 and 4 and, after reading to them those portions of the declarations of Jurors 2 and 5 that dealt with allegations concerning gun experiments (RT 1522), invited Jurors Nos. 3 and 4 to respond in their own words if they wanted to respond.  (CAA at 23; 25.)  These jurors sent him their letters, which the Deputy District Attorney filed with the court.  (CAA at 23-26.)  These letters read as follows:

Juror No. 4:

I'm responding to your call regarding the accusation of juror misconduct on the jury I sat on.  First to answer the accusations that I went home and tested or experimented with my own guns.  At no time did I experiment with my guns.  I also don't recall anyone on the jury saying that they had experimented with their guns.

My father's hobby was gunsmithing.  He had a gun shop in the garage where he built guns beginning to end.  I was involved with helping him and gained a good degree of knowledge about guns.  I hope this makes it clear that my experimenting would be entirely unnecessary.

I do feel that we worked very hard to reach a just and honest verdict.  It seems now that the jury is on trial.  This seems to be a travesty of justice to me.  I am very concerned that distortions to what truly happened in the jury room are being considered.

I spent nearly a month of my life sitting on that jury.  During that time I listened very closely to the courts instructions.  I followed those instructions to the best of my ability and understanding.  I also read the instruction we had many times to be certain I made no mistakes in the process.  Again, this was to the best of my ability and understanding.  I hope this clarifies for the court any questions regarding my conduct on the jury.

I submit this statement under penalty of perjury.

(Juror No. 4's Letter, CAA 24.)

Juror No. 3:

It has come to my attention that certain allegations have been made by a juror who I served with sometime in late October and early November.  I wish to clarify that I or no other person as far as I am aware, attempted to coerce any jury person or persons at any time during the trial of one Louis Baca and [Paulette Villa].  I wish also

to make it clear that I at no time during the trial tested or attempted
to test how a gun jams.  I do not own, nor have access to any type
of firearms now or at the time of the trial of Louis Baca.  I wish to
make it clear I do not like guns and to the best of my knowledge
have not touched a gun since the mid 1960s, when I was in the
United States Army in 1965.

The only reference pertaining to a jammed firearm I may have
made was from personal knowledge from those years about how
difficult it is to unjam a firearm.  I also wish to make it clear that
the discussions about jammed guns was during the possible guilt of
[Paulette Villa] and her involvement in the killing of one David
Martinez and not Louis Baca.  Louis Baca as I recall was only
referred to at the first encounter where the gun may have failed to
fire.

I . . . am making this statement under penalty of perjury of my own
free will.  I am willing to speak to any persons about this matter as
long as [Deputy District Attorney] Tom Testa is present during any
questioning.  Please feel free to contact me at any time at . . . .

(Juror No. 3's March 11, 1998 Letter, CAA 26.)

During argument on defense counsel's motion for new trial, the district attorney

recounted two voicemail messages received from two other jurors in this action:

Today counsel and The Court listened to an answering machine in
the judge's chambers of [Juror #12], . . .  who apparently
telephoned The Court, and I think the record should reflect that she
said in that machine that she felt nothing improper took place
during jury deliberations.  There was no coercion.

She read a newspaper article about what turns out to be juror
number two's comments, and she on the machine left a message
stating, that is, [Juror #12] stating that she felt strongly about this;
that this juror was inaccurate and incorrect and that jurors worked
very hard and [Juror #12] felt nothing improper was taking place.

Also, I think the record should reflect that The Court can consider
in ruling on these motions the phone message that juror number
two left the day – two days after the verdict or whatever that date
was as well as my taped interview with her.  So that is a total of
two jurors.

(RT at 1520-21.)  Thus, the trial court took into consideration information from five jurors:

Jurors Nos. 2, 3, 4, 5 and 12.  (RT at 1521.)  All except Juror No. 12 submitted affidavits or

/////

1   declarations.  (Id.)  After hearing from all counsel, the trial court denied the motion for new trial,

2   as follows:

3           It seems to me that . . . very much of what you're arguing about are
things that are not admissible in the process anyway.  Jurors'

4           thought processes are not fair game here.  What's going on in their
heads is not fair game.  The process they use to arrive at their

5           verdicts is not subject of this discussion at all.

6

7           So if somebody is thinking about a portion of the law that's
incorrect, . . . I think would probably happen in any trial, that's not
something that's going to make any difference.

8

9           The law in this case is an awful lot more complex than the cases
that we generally see.

10          So insofar as somebody saying, well, you know we've got a safety
net here or anything of that sort, I don't think that's anything that

11          has to do with the granting of a new trial motion.

12          The things that do have – that are . . . pertinent are whether or not
somebody – somebody performed an experiment, visited the scene,

13          talked to somebody else, brought that information in the jury room
and so on.

14

15          Whether or not that happened is certainly not clear in this case and,
in fact, seems to me that in my view of . . . what I've read, it's
more probable than not that it didn't happen.

16

17          But even if it did happen, you go to another step, whether or not it
created prejudice.

18          In view of the . . . quality of the evidence in this case and the
important – the relative importance of whether or not the gun could

19          have jammed or did jam or whether or not – how that relates to the
rest of the evidence, in my view does not – it doesn't make very

20          much difference.

21          It doesn't seem to me there's any substantia likelihood at all that
any juror's vote was swayed by this misconduct, if it happened,

22          and I don't believe that it did.

23          So for those reasons, I'm going to deny the motion.

24   (RT 1537-38.)

25          The Sixth Amendment guarantees criminal defendants a verdict by impartial,

26   indifferent jurors.  The bias or prejudice of even a single juror would violate petitioner's right to

a fair trial.  Tinsley v. Borg, 895 F.2d 520 (9th Cir. 1990).  However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Jurors have a correlative duty to consider only the evidence that is presented in open court.  When the jury breaches this duty by considering extraneous facts not introduced in evidence a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence.  Hughes v. Borg, 898 F.2d 695, 699 (9th Cir. 1990).[10]  However, petitioner bears the burden of establishing that a juror's consideration of extrinsic material had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  In Lawson v. Borg, 60 F.3d 608, 612 (9th Cir.1995), the Ninth Circuit set out the standard as follows:

> Jury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment.  However, a petitioner is entitled to habeas relief only if it can be established that the constitutional error had "substantial and injurious effect or influence in determining the jury's verdict."  Whether the constitutional error was harmless is not a factual determination entitled to the statutory presumption of correctness under 28 U.S.C. § 2254(d).

Lawson, 60 F.3d at 612 (Internal citations omitted).

        A juror's past personal experiences may be an appropriate part of the jury's deliberations.  U.S. v. Navarro-Garcia, 926 F.2d 818, 821(9th Cir. 1991)  "Jurors must rely on their past personal experiences when hearing a trial and deliberating on a verdict."  Hard v. Burlington No. Railroad, 812 F.2d 482, 486 (9th Cir.1987).  A juror's personal experiences may constitute extrinsic evidence if a juror relays knowledge regarding the parties or the issues involved in the litigation that might affect the verdict.  See Hard, 812 F.2d at 486 (involving a

_____

[10]  Although the Hughes court found that constitutional error occurred when a police report not introduced into evidence was accidentally allowed to go to the jury in a kidnap and murder case, it held such error was harmless because of the overwhelming evidence of Hughes' guilt.  Id.

1   juror who was allegedly a former employee of the defendant railroad, and who allegedly had

2   personal knowledge of the railroad's settlement practices).

3                   1.  <u>Juror Misconduct During Voir Dire:  Undisclosed Actual Bias</u>

4           Petitioner claims Juror No. 2 lied during voir dire because she failed to disclose

5   that she had a job application pending for employment as an investigator with the welfare

6   department.  Because this position would require Juror No. 2 to work directly with the district

7   attorney's office, petitioner argues Juror No. 2 was biased against her.  Indeed, Juror No. 2 has

8   provided a declaration in which she states she believed she would risk not getting the job if she

9   were the lone hold-out against a first degree guilty verdict.

10           Petitioner fails to present any evidence in support of his claim other than a

11   transcript of a November 13, 2003 interview with Juror No. 2 relaying information she learned

12   during deliberations, and hearsay statements from persons recounting conversations with the

13   jurors about deliberations.  Most of this evidence is barred by Federal Rule of Evidence 606(b).[11]

14           The state appellate court addressed this claim as follows:

15       During voir dire, the jurors were asked to answer a questionnaire
    containing a variety of questions designed to uncover potential

16       bias.  The jurors were asked if there was any reason they should not
    sit on the case or any information they should disclose to the court

17       or the lawyers.  During in-court voir dire, they were provided many
    examples of situations where disclosure would be required.  One

18       prospective juror was questioned about an acquaintance who is a
    prison guard and another was asked about a daughter who worked

19       for the Judicial Council.  The prosecutor also gave examples of
    jurors not mentioning something during voir dire that could be

20       important:  a juror who approached him after trial and said his

21

        [11]   Rule 606(b) reads:  Upon an inquiry into the validity of a verdict or indictment, a

22   juror may not testify to any matter or statement occurring during the course of the jury's
deliberations or to the effect of anything upon that or any other juror's mind or emotions as

23   influencing the juror to assent to or dissent from the verdict or indictment or concerning the
juror's mental processes in connection therewith, except that a juror may testify on the question

24   whether
extraneous prejudicial information was improperly brought to the jury's attention or whether any

25   outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or
evidence of any statement by the juror concerning a matter about which the juror would be

26   precluded from testifying be received for these purposes.

niece had been killed or a juror who revealed after trial that he was arrested once.

After a verdict was reached but before judgment and sentencing, juror #2 telephoned the trial judge and indicated she was not convinced beyond a reasonable doubt of Baca's guilt.  She felt pressured to reach a verdict, however, so the jurors could all go home.  She was interviewed by the prosecution and the defense.  She disclosed that she had submitted an application for employment as an investigator with the welfare department.  The position, she believed, would require her to work directly with the district attorney's office.  She also stated she was concerned that being a hold-out juror would jeopardize her chance of getting the job and would negatively impact the public fisc.  The application was not disclosed on juror #2's questionnaire or during voir dire.

Baca's lawyer requested the court to release the names and personal information about the remaining 11 jurors.  The court denied the request, stating that "[e]ven if what the one juror had said is true, it doesn't appear to the Court that anything improper was done to overbear her will."

"We begin with the general proposition that one accused of a crime has a constitutional right to a trial by impartial jurors."  (*In re Hitchings* (1993) 6 Cal.4th 97, 110.)  Voir dire examination of prospective jurors is the essential means by which impartiality can be explored.  "The prosecution, the defense and the trial court rely on the voir dire responses in making their respective decisions, and if potential jurors do not respond candidly the jury selection process is rendered meaningless.  Falsehood, or deliberate concealment or nondisclosure of fact and attitudes deprives both sides of the right to select an unbiased jury and erodes the basic integrity of the jury trial process."  (*People v. Blackwell* (1987) 191 Cal.App.3d 925, 929.)

A juror's responses to inquiries posed during voir dire enables a criminal defendant to exclude a juror for cause or to exercise a peremptory challenge for suspected bias.  When jurors violate their oath of full disclosure they commit misconduct.  "A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct."  (*In re Hitchings, supra,* 6 Cal.4th at p. 111.)

[Petitioner and her co-defendant Baca] maintain that the juror's potential connection to law enforcement is a measure of bias and would have subjected the juror to challenge for cause.  They argue, moreover, that a juror's concealment need not be intentional.  (*People v. Diaz* (1984) 152 Cal.App.3d 926, 934-935.)  *Diaz* has been criticized and distinguished.  (*People v. McPeters* 91992) 2 Cal.4th 1148, 1175-1176; *People v. Jackson* (1985) 168

34

Cal.App.3d 700, 704-706; *People v. Kelly* (1986) 185 Cal.App.3d 118, 126.)

"Although intentional concealment of material information by a potential juror may constitute implied bias justifying his or her disqualification or removal [citations], mere inadvertent or unintentional failures to disclose are not accorded the same effect. '[T]he proper test to be applied to unintentional "concealment" is whether the juror is sufficiently biased to constitute good cause for the court to find under Penal Code sections 1089 and [former] 1123 that he is unable to perform his duty.' (*People v. Jackson* (1985) 168 Cal.App.3d 700, 706.)" (*People v. McPeters, supra*, 2 Cal.4th at p. 1175.) We must determine whether the trial court abused its discretion in finding no misconduct. (Id. at p. 1175.)

We begin by pointing out the general nature of the questions posed the jurors during written and oral voir dire. It is not surprising that a juror might neglect to disclose a pending application to become a welfare investigator when asked the broad question as to whether she had any information she believed she should disclose. While the jurors were admonished to disclose whether they had been victims of a crime or were related to someone who was and other specific questions designed to disclose bias or a conflict, they were not asked any specific questions about prospective employment. We disagree with [petitioner and her co-defendant] that the examples provided by the court and the prosecution would have alerted juror #2 to disclose the application. The possibility that the juror might get the job and might have to work with the district attorney's office was too attenuated to infer that the juror intentionally concealed information regarding her application, particularly in the absence of any specific questions designed to elicit such information. (*People v. Majors* (1998) 18 Cal.4th 385, 417-420.) We do agree with [petitioner and her co-defendant] that the juror's comment that her hesitancy to hold out any longer was attributable, at least in part, to the impact it would have on her pending application comes perilously close to demonstrating actual bias. Nevertheless, since "the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination" (*People v. McPeters, supra,* 2 Cal.4th at p. 1175), we cannot say the court abused its discretion in finding there was no intentional concealment and no actual bias.

None of juror #2's comments regarding her post-conviction second thoughts about the propriety of the verdict were admissible, including her concerns about the expense of a retrial if the jury hung. They constitute impermissible inquiry into the thought processes of individual jurors during deliberations. (*In re Hamilton* (1999) 20 Cal.4th 273, 294.) As to whether she was improperly coerced into changing her vote to reach a unanimous verdict, we agree with the trial court that her testimony revealed

/////

35

1    her own inner turmoil rather than improper badgering from the
     other jurors.

2

3    (People v. Villa, slip op. at 10-14.)  Petitioner's claims were denied by the California Supreme

4    Court without further comment.

5            The United States Supreme Court has examined whether a habeas petitioner's

6    right to an impartial jury was violated where a juror submitted an application for employment as

7    an investigator in the District Attorney's Office during the petitioner's trial.  Smith v. Phillips,

8    455 U.S. 209, 212 (1982).  Smith argued that "[g]iven the human propensity for self-justification

9    . . . the law must impute bias to jurors in [such a] position."  Id. at 215.  The Supreme Court

10   disagreed, explaining that it had "long held that the remedy for allegations of juror partiality is a

11   hearing in which the defendant has an opportunity to prove actual bias."  Id.; see also id. at

12   215-17 (discussing Chandler v. Florida, 449 U.S. 560 (1981), Remmer v. United States, 347 U.S.

13   227 (1954), and Dennis v. United States, 339 U.S. 162 (1950)).

14           In the instant case, the trial judge held a hearing on petitioner's motion for new

15   trial at which time he considered the declaration of Juror No. 2 and decided there had been no

16   actual bias.  (RT 1508-1538; CT 708-713.)  Although petitioner contends the trial judge should

17   have held an evidentiary hearing to further inquire of Juror No. 2, based on the record at hand,

18   this court cannot find that such an evidentiary hearing would have been fruitful.

19           Moreover, this court cannot find that the trial judge's failure to hold an

20   evidentiary hearing states a constitutional violation under AEDPA.  "Clearly established federal

21   law, as determined by the Supreme Court, does not require state or federal courts to hold a

22   hearing every time a claim of juror bias is raised."  Tracey v. Palmateer, 341 F.3d 1037, 1045

23   (9th Cir. 2003), cert. denied, Tracey v. Belleque, 125 S.Ct. 196 (2004).  Thus, this court cannot

24   find that the trial judge's refusal to hold an evidentiary hearing at which he would question any or

25   all of the jurors was contrary to or an unreasonable application of clearly established federal law.

26   /////

1    Even if this court considered the evidence presented by Juror No. 2, petitioner

2  would not be entitled to relief.  The evaluation of such claims of juror misconduct proceeds

3  according to a two-part test:  (1) whether a juror failed to answer honestly a material question on

4  voir dire; and (2) whether a correct answer would have provided a valid basis for a challenge for

5  cause.  McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984).[12]

6    No evidence has been presented indicating Juror 2 lied during voir dire.  No one

7  asked the potential jurors questions concerning prospective employment.  Petitioner has failed to

8  present evidence indicating Juror No. 2 intentionally kept this pending employment application

9  secret.  In her 2003 interview, Juror No. 2 confirmed that during voir dire it did not occur to her

10 that her pending job application would pose a problem with her deciding guilty or not guilty.

11 (January 14, 2004 Decl. at 21.)

12    Furthermore, petitioner fails to show Juror No. 2 would have been excused for

13 cause had the court been informed of her pending employment application.  Juror No. 2 had

14 applied for a position as a welfare investigator with the welfare department.  (Id. at 11.)  If Juror

15 No. 2 had noted her pending application with the welfare department, it is not clear a follow-up

16 question would have been asked or whether Juror No. 2 would have volunteered the fact that the

17 new job would require her to work closely with the district attorney's office.

18    Moreover, Juror No. 2's job application was pending; there was no guarantee or

19 certainty that Juror No. 2 would get the position.  Indeed, Juror No. 2 was subsequently

20 interviewed twice and was not offered the position.  (Id. at 21.)  Just because Juror No. 2 would

21 potentially have been required to work closely with the district attorney's office does not mean

22 she could not impartially serve as a juror in this case.  Only those reasons that affect a juror's

23 impartiality can be said to affect the fairness of a trial.  McDonough Power Equipment, Inc. v.

24 Greenwood, 464 U.S. 548, 556 (1984).  There is no evidence that Juror No. 2's chances of getting

25

26    [12] This standard applies in civil and criminal cases.  See id.; United States v. Aguon, 851
   F.2d 1158, 1170 (9th Cir.1988) (en banc).

37

the position would have been affected by her service on the jury, even had she held out against a first degree murder conviction.  Juror No. 2's misapprehension that it would goes to her mental processes in reaching the verdict which this court may not consider.  Cal. Evid. Code § 1150;[13] Fed. R. Evid. 606(b).  The 2003 interview of Juror No. 2 confirms this:

> Q:  "Was it ever brought to your attention that if you didn't vote a certain way that this might affect your job, by anybody?"
>
> A:  "No.  It was not; it was just in my mind."
>
> Q:  "It was never inferred to you or anything else like that?
>
> A:  "No, it was not."

(January 14, 2004 Decl. at 12.)

Moreover, it appears that most of Juror No. 2's qualms over the verdict were her second thoughts about having voted guilty of first degree murder.  The bulk of her declaration focuses on how she felt pressured to join the other jurors in their guilty votes and how she just wanted to "get out of there."  Her mention of her pending job application long after voir dire and after days of jury deliberation also struck the district attorney as incredible.  (RT at 1523-24.)  In her 2003 interview, Juror No. 2 confirmed she wanted to "get out of there."  (January 14, 2004 Decl. at 17.)  She also explained why she changed her vote:

> Q:  "You finally succumbed if you will for lack of a better word to what was it exactly why you changed your mind?"
>
> A:  "Just because I wanted to get out of that deliberation room; the judge did not tell us and I thought that, I've never served on a trial before obviously, but I thought after so many days of not coming up with a decision that the judge would declare that we were deadlocked I did not realize that I was the one who would have to declare that we were deadlocked because the jury foreman was not

---

[13]  "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."  Id.

1   going to and I didn't realize that I was going to have to declare that
and so after four days of people going like this at me. . . "

2

3   Q:  "Just for the record you were basically demonstrating your
arms crossed and kind of glaring."

4   A:  "Yes.  Yes, and it was just before Thanksgiving and people
wanted to go home for Thanksgiving they didn't want to think

5   about this trial anymore.  I was spending a lot of time in the
restroom crying because I felt like I was the only one that was not."

6

7   Q:  "When you say that you were the one that was going to have to
basically tell the judge that you deadlocked does this go back to
your earlier statement about maybe there being some reprisal or

8   some issue with you maybe getting your job later on?"

9   A:  "I don't think I was thinking about it at that point, no."

10   Q:  "But it was an issue before?"

11   A:  "Yes."

12   Q:  "And it was an issue in your overall decision-making process?"

13   A:  "Yes.  And I finally told them after being in there for four days
with them and people saying 'well lets get on with it because we

14   still have this other codefendant that we have to come up with a
decision on and we haven't even made a decision and we still have

15   to get this done' and after four days of all of this I finally said I will
vote guilty if that's what you want me to do, but I do not feel that

16   he is guilty of first-degree murder and I did say that."

17  (January 14, 2004 Decl. at 15-16.)

18   Q:  "However during the proceedings it came to your mind that you
would be applying for a position and that it might affect your job?"

19

20   A:  "Yes."

21   Q:  "Do you think that at that time it had an effect on your decision
other than the glaring and staring by the jurors I mean was it a

22   combination of?"

23   A:  "It could have been, yes."

24  (January 14, 2004 Decl. at 21.)  Although petitioner argues that "due in substantial part to [Juror

25  No. 2's] fear that she would not get the job if she held out, she caved into the pressure being

26  exerted by the majority of jurors and voted for first degree murder" (Points and Authorities in

Support of Traverse at 8), it is just as likely that Juror No. 2 simply felt pressure from the other jurors because she was the sole holdout juror and changed her vote because she wanted to get out of there.

Juror No. 2 still had the remainder of the deliberations period on petitioner's co-defendant Villa's guilt in which to voice her change of heart as to her vote on petitioner's guilt or to notify the court of her perceived conflict with her pending job application.  Juror No. 2 did neither.  Juror No. 2 also had further opportunity to alert the court when the jurors were individually polled after the verdict was announced.  Juror No. 2 did not; rather, she confirmed her guilty vote on first degree murder with special circumstance.

After the verdict was rendered and Juror No. 2 had an opportunity to discuss her situation with her co-worker and others, her co-worker encouraged her to call the trial judge.  (Id. at 18.)  She recalled she told the trial judge she only voted because she "felt pressured to vote for first degree [rather than] second degree."  (Id. at 19.)

In light of this record, this court cannot find that the state court's decision that there was no intentional concealment and no actual bias on the part of Juror No. 2 was contrary to, or an unreasonable application of, applicable federal law.

2.  Handling of Juror No. 2's Claim of Bias

Petitioner also argues that there was judicial error in the handling of Juror No. 2's claim of bias rendered after the verdict.  When Juror No. 2 called the trial judge and disclosed her alleged bias, the trial judge contacted the district attorney before he contacted defense counsel. However, defense counsel was ultimately advised of the telephone call from Juror No. 2 and timely filed a motion for new trial based on Juror No. 2's declaration.  (Clerk's Augmentation on Appeal at 4-22.)  While the trial judge should have promptly notified defense counsel simultaneously or at least immediately after notifying the district attorney, his failure to do so was not so fundamental as to render the conviction void.  See Rushen v. Spain, 464 U.S. 114, 126-27 (1983).

1         3.  "Pervasive" Juror Misconduct

2         Petitioner also alleges that other pervasive jury misconduct occurred which

3  required the state court to hold an evidentiary hearing where all jurors should be questioned as to

4  such matters.

5         The affidavits from the jurors indicate that during deliberations, jurors discussed

6  petitioner's failure to testify.  Federal Rule of Evidence 606(b) precludes inquiry into the thought

7  processes of jurors during deliberation.  This rule applies to petitions for habeas corpus from

8  state court prisoners.  <u>See</u> Fed. R. Evid. 1101(e).  Jurors' statements have traditionally been

9  inadmissible to impeach the verdict.  <u>Tanner v. United States</u>, 483 U.S. 107, 115 (1987).  As

10  recognized above, the rule has an exception for statements alleging that a jury has been subject to

11  "extraneous influence."  <u>Id.</u>  The jury's privacy should be violated only to redress acts which

12  themselves violate that privacy.  <u>Id.</u>

13         Where it is alleged that a juror's statement demonstrates that the jury

14  misunderstood the law, that statement cannot be used to attack the verdict.  <u>See</u> <u>United States v.</u>

15  <u>Span</u>, 75 F.3d 1383, 1390 n.8 (9th Cir.1996).  Nor may a defendant offer jurors' statements to

16  establish motives of individual jurors and preconceived notions as to a defendant's guilt.  <u>See</u>

17  <u>United States v. Davis</u>, 960 F.2d 820, 828 (9th Cir.), <u>cert.</u> <u>denied</u>, 506 U.S. 873 (1992); United

18  <u>States v. Pimentel</u>, 654 F.2d 538, 542 (9th Cir.1981).

19         Absent an allegation that extraneous prejudicial information was brought to the

20  jury's attention, this court may not review the jury's deliberative process.  Petitioner's allegations

21  concerning the jurors' discussion of his failure to testify or their misunderstanding about what

22  order to consider the criminal charges must therefore be rejected.

23         The only other potentially viable claim raised was an allegation that the jurors

24  experimented or brought in personal expertise concerning weapons for use in deliberating over

25  whether or not the gun jammed during part of the criminal transaction.  Juror No. 5 stated that

26  Jurors No. 3 and 4 informed the jury that they had gone home after deliberation and conducted

1   experiments with their own handguns to determine how a casing would jam in their guns and

2   shared the results with the jury.  (Juror No. 5's March 3, 1998 Decl., CAA at 21.)  However,

3   Jurors No. 3 and 4 both denied conducting experiments and relayed the basis of their personal

4   knowledge concerning weapons.  (Letters from Jurors Nos. 3 & 4, CAA at 24, 26.)

5            Petitioner's co-defendant Villa raised this particular claim on appeal.  The state

6   appellate court found there was substantial evidence such experimentation did not occur based on

7   the two accused jurors' express denials.  (People v. Villa & Baca, slip opinion at 14.)  The

8   appellate court then confirmed that there was no substantial likelihood any experimentation

9   caused juror bias toward Villa:

10           Moreover, the trial court also found that any possible misconduct
             would not have had a substantial likelihood of influencing the vote
11           of any of the jurors.  We recognize that "the test for determining
             whether juror misconduct likely resulted in actual bias is 'different
12           from, and indeed less tolerant than,' normal harmless error
             analysis, for if it appears substantially likely that a juror is actually
13           biased, we must set aside the verdict, no matter how convinced we
             might be that an unbiased jury would have reached the same
14           verdict."  (In re Carpenter, supra, 9 Cal.4th at p. 654.)

15           Villa testified she had no familiarity with guns, but that Baca
             complained the gun was jammed.  The issue before the jury was
16           her mental state, not how the gun might have been jammed or
             cleared.  She would have us believe that she, relying on Baca's
17           statement the gun was jammed, thought the victims were insulated
             from harm.  Since her mental state was independent of her
18           knowledge about the gun any experimentation regarding its
             operation was immaterial.  The likelihood of bias arising from any
19           experimentation must be substantial.  We accept the trial court's
             determination there was no substantial likelihood any
20           experimentation caused juror bias.

21   (People v. Villa & Baca, slip op. at 14-17.)  Similarly, the issue in petitioner's case hinged on

22   petitioner's mental state:  whether or not he evidenced intent to commit first degree murder.

23   There was no question he shot the gun.  It appears that even had the experiments occurred, there

24   was no substantial likelihood any experimentation caused prejudice to petitioner.  Thus,

25   petitioner has failed to demonstrate that juror's consideration of extrinsic material had a

26   /////

1  "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v.</u>

2  <u>Abrahamson</u>, 507 U.S. 619, 637 (1993).

3           In addition, it was not error for the jurors to discuss their personal knowledge and

4  opinions about how a weapon jams.  The Ninth Circuit has held that "a juror's past personal

5  experiences may be an appropriate part of the jury's deliberations." <u>Grotemeyer v. Hickman</u>, 393

6  F.3d 871, (Dec. 15, 2004) (quoting <u>United States v. Navarro-Garcia</u>, 926 F.2d 818, 821 (9th

7  Cir.1991).

8           In light of the above, petitioner's claims of juror bias and/or misconduct should be

9  denied.

10          For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

11 petitioner's application for a writ of habeas corpus be denied.

12          These findings and recommendations are submitted to the United States District

13 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

14 days after being served with these findings and recommendations, any party may file written

15 objections with the court and serve a copy on all parties.  Such a document should be captioned

16 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17 shall be served and filed within ten days after service of the objections.  The parties are advised

18 that failure to file objections within the specified time may waive the right to appeal the District

19 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

20 DATED:  January 10, 2006.

21

22                                      UNITED STATES MAGISTRATE JUDGE

23

24 001;baca1685.157

25

26

43